[Civ. No. 17080. First Dist., Div. One. Dec. 26, 1956.]

CHARLES H. VANOLI et al., Appellants, v. RUSSELL S. MUNRO, as Director of Alcoholic Beverage Control, etc., et al., Respondents.

John G. Evans for Appellants.

Edmund G. Brown, Attorney General, and Charles A. Barrett, Deputy Attorney General, for Respondents.

PETERS, P. J.—The appellants are the holders of off-sale liquor licenses attached to premises located near Stanford University. The State Board of Equalization found that such premises were located so near the Stanford campus as to violate the law, and ordered the licenses indefinitely suspended. This was affirmed by the Appeals Board. The superior court denied a petition for a writ of mandate, and entered its judgment accordingly. From that judgment the license holders appeal.

The sole question presented is whether the premises operated by appellants are within one and one-half miles of the Stanford campus within the meaning of section 172a of the Penal Code. If so, the licenses were properly suspended.

Section 172a of the Penal Code provides, in part: "Every person who, upon or within one and one-half miles of the university grounds or campus, upon which are located the principal administrative offices of any university having an

enrollment of more than one thousand students, more than five hundred of whom reside or lodge upon such university grounds or campus, sells, gives away or exposes for sale, any intoxicating liquor, is guilty of a misdemeanor . . .''*

Stanford University owns some 9,000 acres of land in Santa Clara and San Mateo Counties. In 1918, and again in 1934, the board of trustees of Stanford designated 1,054 acres of this area ''as the official campus boundary that was set aside for educational purposes.'' There is a concrete monument now located at the southeast corner of that 1,054-acre tract. A recent survey in which measurements were taken from that monument proved that the premises of the appellants are located within 1½ miles of this monument, the measurements having been taken in a straight line from the monument. Appellant Parmiani's premises are located 33 feet within 1½ miles of the monument, while appellant Vanoli's premises lie 472 feet within the statutory limit.

Appellants do not contend that their premises are not within a mile and one-half of the monument.† Their claim is that, included within the 1,054-acre tract, are four plots of land which are not part of the ''university grounds or campus'' as those terms are used in section 172a of the Penal Code. These four plots are located between the premises of appellant and the actual administrative buildings of the university. The question involved is whether these four plots are properly included within the campus area within the meaning of section 172a.

The four plots are contiguous. Plot number one is farthest from the concrete monument. It begins at Sam McDonald Road and runs for 377 feet along El Camino Real. There are no buildings on this lot. It has two uses: It is used for intermural athletics, and for parking automobiles during football games. Plot number two has a frontage of 410 feet on El Camino Real. It has no buildings on it but has some hitching racks to which the extra polo ponies are hitched dur-

---

*It was stipulated at the oral argument that Stanford University has an enrollment of more than 1,000 students, more than 500 of whom reside on the university grounds.

†Appellants have owned their respective licenses for several years. Apparently, the licenses were secured in the good faith belief that the premises of appellants were outside the mile and one-half limit. However, there is no evidence that the Board of Equalization represented to appellants that their premises were outside the mile and one-half limit, nor is there any other evidence upon which a claim of estoppel could be based.

ing polo games. The third plot runs about 460 feet along El Camino Real. This lot is used for three purposes—it is the polo field; it is used by the Department of Athletics for golf instruction; and it is used for parking automobiles during football games. The fourth plot extends for about 627 feet along El Camino Real and ends at the concrete monument here under discussion. On this plot is a cottage, shed and barn. The cottage is occupied as a residence by some of the cashiers employed at the University. ''[A]ctually this residence . . . was for many years used as a part of the operation of the university.'' The whole plot is sparsely covered with trees, and occasioanlly the superintendent of the athletic grounds cuts the volunteer hay that grows on it.

It is appellants' main contention that none of the four plots between Sam McDonald Road and the concrete monument are properly part of the ''university grounds or campus, upon which are located the principal administrative offices of any university'' as those terms are used in section 172a of the Penal Code.

It should be noted that the 1054 acres designated by the board of trustees ''as the official campus'' in 1918 and 1934, and which include the four lots above described, is an undivided area, and that the ''principal administrative offices'' of Stanford are located on this 1054 acres. It should also be noted that all parties to this appeal agree that the 1½ miles noted in section 172a is to be measured from the boundary of the campus ''upon which are located the principal administrative offices'' of Stanford, and that such measurement is to be by air line from such boundary. (See *Leland Stanford Jr. University* v. *State Board of Equalization,* 1 Cal.2d 784 [37 P.2d 84, 96 A.L.R. 775]; *Gunn* v. *State Board of Equalization,* 123 Cal.App.2d 283 [266 P.2d 840].)

In support of their contention that the 1054-acre area includes lands not within the purview of section 172a, appellants place their main reliance on *Matter of Petition of Burke,* 160 Cal. 300 [116 P. 755]. That case held section 172a to be constitutional under the police power, and also held that there were certain, though quite indefinite, limits to the ''campus'' contemplated by the code section. In so holding, the court stated (p. 305): '' 'Principal administrative offices' is not a fortunate phrase in a penal law such as this, since very clearly it requires construction. . . . The phrase is used as descriptive of the character of the grounds or campus to which the penal law is made to apply. It is not made to

apply to university grounds or a university campus generally. Thus, treating of the University of California, it would not apply to its subordinate grounds where special educational activities were in progress. It would not apply to the Lick Observatory. It would not apply to the Affiliated Colleges. It would not apply to its agricultural stations, but would apply only to those grounds and that campus which form the center of its activities, and where, because they are the center of its activities, the 'principal administrative offices' within the meaning of the law must be located. In this sense the 'principal administrative offices' does not mean those offices and those activities through which the university as an institution is organized and financed. It means the principal place of business of the university *as a university* where the principal educational functions of the university are carried out. So construed the law means to limit the inhibition upon the sale of liquor to what we may designate the university proper, and the language is so chosen to avoid any possible application of the law to any outlying grounds or campuses, and so construed, there is nothing unreasonable in the phrase 'principal administrative offices.' "

It is contended by appellants that the four plots here under discussion are "outlying," or "subordinate" grounds within the meaning of the Burke case.

Respondents place considerable reliance on the case of *Leland Stanford Jr. University* v. *State Board of Equalization,* 1 Cal.2d 784 [37 P.2d 84, 96 A.L.R. 775], which involved the proper application of section 172a to the campus of Stanford. In that case, over the protest of the board of trustees, a liquor permit was granted to a drugstore in Palo Alto. This authorization was cancelled by the Supreme Court on the ground that the drugstore was within the mile and a half limit fixed by section 172a. It was stipulated by the parties that the drugstore was .7 of a mile in the usual course of travel, and shorter by direct line "from the nearest point on the boundary of the aforesaid campus of the university, as that boundary was defined and established by the board of trustees of the university on December 27, 1918." (P. 786.) Thus, the parties in this case stipulated, in effect, that, if the boundary of the campus was to be used to start the measurement, it was the boundary of the 1054 acres fixed by the trustees in 1918. The main contention was that the measurement should be from the site of the principal administrative offices of the university. It was stipulated that the drugstore

was 2.25 miles from such offices in the usual course of travel, but 1.345 miles from said offices measured in a straight line. The court concluded (p. 786) : "We are of the view that the distance is to be measured from the campus limits, and by a direct and straight line."

It will be noted that, measured in a straight line, the drugstore was within the 1½ mile limit not only from the campus boundary but from the administrative offices of the university. Moreover, in that case, it was not challenged that if the boundary of the campus should be used as the starting point, .it should be the boundary as fixed by the trustees in 1918. So far as the opinion discloses, there was no contention that any "outlying" or "subordinate" lands were improperly included in that area thus fixed. For these reasons we agree with appellants that this case is not a controlling authority in the case at bar.

In discussing the purpose of section 172a, it is apparent that the Legislature decided to limit the sale of intoxicants to a certain area, being 1½ miles from the boundaries of the "campus, upon which are located the principal administrative offices of the university." ■ It is equally clear that such campus includes more than the areas actually occupied by the "principal administrative offices" of the university. Obviously, the lands surrounding such offices, and the lands surrounding the buildings used for educational purposes actually form an integral part of the campus. The question is, how much surrounding land can be included in the campus within the meaning of section 172a? In this connection the Burke case, *supra*, is of relatively little help. We do know from that case that disconnected areas cannot be considered. But that is not this case. We also know from that case, and the case in 1 Cal.2d 784, *supra*, that the lands surrounding the administrative offices and the buildings used for educational purposes can properly be included in the area described in section 172a. The Burke case does use the language "principal place of business of the university *as a university*." (160 Cal. 305.) The case also discusses the purpose of the statute : "The law under consideration is penal. It is passed in the exercise of the police power. Its very apparent design is to protect students in the formative periods of their lives from the temptations of alcoholic drink. There is no occasion to point out the evils to which such alcoholic indulgences lead, in the deterioration of the moral and physical fibre of the student, in the destruction of discipline and in the general

demoralization not alone to the student but to the educational institution itself which follows.'' (160 Cal. at p. 303.)

Thus, it seems clear that some surrounding area, in addition to that covered by the administrative offices, was intended to be included within the area described in section 172a. Obviously, a modern university, with its class rooms, its laboratories, its dormitories and its athletic and other facilities, covers an area in excess of the area covered by the administrative offices. This additional area is just as much a part of the campus, and as important to the university as a university as the administrative buildings themselves. The real question is, who shall decide the extent of the university campus? In the first instance, this question should be determined by the governing board of the university. That board knows the area necessary for university purposes. That board's determination is not conclusive, however. Such board could not include noncontiguous lands, nor lands obviously not connected with the university and not used for university purposes. ■ In the instant case, the board of trustees decided in 1918, and again in 1934, that ''the official campus boundary that was set aside for educational purposes'' should encompass the 1054 acres here involved. That determination, while not conclusive, is entitled to some weight. ■ The hearing officer, the State Board, and the Appeals Board necessarily held that there was no abuse of discretion in thus fixing the boundaries of the campus. This was affirmed by the superior court. Under the facts, we cannot hold that these agencies abused their powers. It must be conceded that the connection of several of the four plots with the operations of the university as a university is somewhat vague, but certainly, none of the four plots is so unconnected with the university as to permit us to hold, as a matter of law, that they are not part of the university proper. This was a matter for administrative determination which, in the absence of abuse, cannot and should not be controlled by the courts.

■ Appellants also point out, correctly, that neither the third nor fourth plots of land has been claimed by the university as exempt from real property taxation as lands devoted to educational purposes. Therefore, so it is argued, these two lots have not been used by the university for educational purposes. This is a *non sequitur*. Under the pertinent constitutional and statutory provisions (Const. art. IX, § 10, art. XIII, § 1a, and Ed. Code, § 21341) Stanford is entitled

to a tax exemption of but 100 acres, so that its failure to claim as tax exempt lands not entitled to the exemption, even though used for university purposes, is without legal significance.

In view of the claimed good faith of appellants the penalty—indefinite suspension of the licenses—may seem severe. But once it was determined that the licensed premises were within the area prohibited by section 172a of the Penal Code, and no facts sufficient to support an estoppel were offered, the liquor authorities had no discretion. They had no power to excuse the violation. If it is a fact that appellants acted in good faith and have invested large sums in reliance on the issuance of the licenses, it may be that they would be entitled to legislative relief. But such relief cannot be granted by the courts.

The judgment appealed from is affirmed.

Bray, J., and Wood (Fred B.), J., concurred.